UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LINSEL WITCHER and
ZORITA KOENIG-WITCHER,

        Plaintiff,

vs.                      Case No.   3:06-cv-318-J-33TEM

CIGNA GROUP INSURANCE,

        Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Witcher's Motions for Summary Judgment (Doc. ##13 and 22), filed on June 1, 2006 and August 3, 2006, respectively; Life Insurance of North America's (LINA)[1] Motion to dismiss (Doc. #14), filed on June 14, 2006; LINA's Motion to Strike Witcher's Motion for Summary Judgment (Doc. #15), filed on June 14, 2006; and LINA's Motion for Summary Judgment (Doc. #24), filed on August 14, 2006.  Lina filed a response (Doc. #26) to Witcher's second motion for summary judgment (Doc. #22).  Witcher filed a response (Doc. #16) to LINA's motions to dismiss and strike.  Witcher also filed a response (Doc. #27) to LINA's motion for summary judgment.  For the reasons stated below, LINA's motion for summary judgment (Doc. #24) is granted, LINA's

---

[1] Witcher improperly named the defendant.  Cigna Group Insurance is not one company.  Rather, Cigna Group Insurance is a family of companies, which includes Life Insurance of North America (LINA).  LINA is the company that issued the policy, which is the subject of this ERISA action.  As such, LINA is the proper defendant.

motion to dismiss (Doc. #14) is denied as moot, Witcher's first motion for summary judgment (Doc. #13) is denied as moot, Witcher's second motion for summary judgment (Doc. #22) is denied, and LINA's motion to strike (Doc. #15) is denied as moot.

**I. Procedural History**

On December 23, 2005, pro se plaintiffs, filed their original complaint in the Fourth Judicial Circuit in and for Duval County, Florida. (Doc. #14 at 1.)  LINA removed the case, claiming that plaintiffs' state law claims were completely preempted by the Employee Retirement Income Security Act of 1974 (ERISA). (Id. at 2.)  After removal, LINA moved to dismiss the plaintiffs' complaint. (Id.)  On May 16, 2006, the Court granted the motion, finding that ERISA superseded plaintiffs' state law claims; thus, the state law claims were due to be dismissed. (Doc. #11.)  The Court explicitly granted plaintiffs leave to amend. (Id. at 4.)

Though the Court had already granted leave to amend, on June 1, 2006, plaintiffs moved for leave to amend. (Doc. #12.)  On the same day, plaintiffs also filed a motion for summary judgment, even though the case had been dismissed with leave to amend and an amended complaint had not been filed.  LINA, on June 14, 2006, filed a motion to strike Witcher's motion for summary judgment (Doc. #15) and a motion to dismiss with prejudice(Doc. #14).  On June 22, 2006, plaintiffs filed an amended complaint (Doc. #17).  On July 11, 2006, the magistrate denied as moot plaintiffs' motion

for leave to amend, as the Court had already granted leave to amend. (Doc. #19.)

After filing their amended complaint, on August 3, 2006, plaintiffs filed another motion for summary judgment (Doc. #22). On August 24, 2006, LINA filed a motion for summary judgment (Doc. #24).

**II. FACTS**

Linsel Witcher (Witcher) was employed by DynCorp (Doc. #24 at 2). Witcher participated in DynCorp's group insurance plan. (Id.) Witcher was covered by the plan's accidental death & dismemberment insurance. (Id.) LINA insured the policy and served as the claim administrator. (Id.)

On December 8, 2003, Witcher was involved in an automobile crash. (Doc. #24-11 at 46.) Witcher's vehicle veered off the road, striking a palm tree. (Id.) The impact caused Witcher's vehicle to spin and almost overturn. (Id.)

The police and fire rescue responded to the scene. The attending police officer, Officer Jackson, found an empty bottle of vodka in the vehicle. (Id. at 49.) Further, Officer Jackson reported that a strong smell of alcohol emanated from Witcher. (Id.) Officer Jackson also took the statement of Matt Kenyon. (Id. at 46.)

Kenyon resided near the accident site. (Id.) Kenyon heard the accident and promptly thereafter arrived at the scene. (Id.)

Kenyon observed Witcher lying in the back seat of the damaged vehicle. (Id.) Kenyon did not see anyone else in the car. (Id.) Further, Kenyon did not see any other individual in or around the area of the crash. (Doc. #24-9 at 6.) Summarizing Kenyon's statement, Officer Jackson stated that "[Kenyon] said he was almost immediately at the scene after the crash and if any one else had been there he would have observed them either in the car or around the car." (Doc. #24-9 at 6).

The paramedics stabilized Witcher with a headboard and transported Witcher to Shands Hospital. (Doc. #24-9 at 32.) Witcher was treated for, among other things, a spinal cord injury. (Doc. #24 at 4.) This spinal cord injury rendered Witcher a complete quadriplegic. (Doc. #24-13 at 31). Shands employees analyzed Witcher's blood. The results indicated that Witcher's blood alcohol level was .192%, more than twice the legal limit for a driver. (Doc. #24 at 5.) The Florida Department of Law Enforcement (FDLE) also analyzed Witcher's blood. (Doc. #24-11 at 23.) The analysis revealed that there was .179 grams of ethyl alcohol per hundred milliliters. (Id.) The FDLE performed another analysis. (Id.) That analysis revealed .180 grams of ethyl alcohol per hundred milliliters. (Id.) These amounts were above the legal limit, and an arrest warrant was issued for Witcher. (Id.) The police report indicates that Witcher's medical condition prohibited service of the warrant. (Id.) Further, in a conversation with a LINA investigator, Officer Jackson represented

that Witcher may not be prosecuted because it would not be cost effective to incarcerate Witcher in light of his medical needs. (Doc. #24-11 at 31.)

Witcher was released from Shands on February 5, 2004. (Doc. #24-11 at 11.) Witcher was transferred to the Brooks Rehabilitation Center. (Id. at 13.) From the Brooks Rehabilitation Center, Witcher was transferred to Kindred Hospital. On June 24, 2006, Witcher was discharged from Kindred and admitted to Memorial Hospital. (Doc. #24-13 at 15 and 17.) On July 8, 2004, Memorial Hospital discharged Witcher into his wife's (Zorita) custody for home care. (Doc. #24-13 at 17.)

After discharge, Zorita found Witcher's LINA policy. (Doc. #13 at 4.) Zorita contacted DynCorp's human resource department, who confirmed that Witcher may be eligible for benefits under the policy. (Id.) The human resources department sent Zorita the claim forms, and Zorita submitted a completed form in September 2004. (Id.) The claim form included a section which asked where and how the accident occurred. Zorita responded as follows "Jacksonville, FL lost the control of the car and hit a three [sic]." (Doc. #24-13 at 12.) Marcy Miller was the assigned accident claims specialist. (Id. at 8.)

In the course of investigating the claim, Miller referenced the group accident policy; the claim form; medical documentation from Shands, Kindred and Memorial hospitals; the Florida Crash

Report; and Miller's phone conversation with Officer Jackson. (Doc. #24-11 at 25.) The policy provides benefits for accidental injuries and contains an exclusion for self-inflicted injuries. (Doc. #24-11 at 24.) Based on the police report and other referenced sources, LINA found that Witcher voluntary consumed alcohol and decided to drive. (Id.) As such, LINA determined that Witcher's injuries were self-inflicted and not accidental. (Id.) Accordingly, LINA denied Witcher's claim. (Id. at 26.) The denial letter included a section that informed Witcher of his right to appeal the decision. (Id.)

Witcher hired an attorney, Carolyn Wagner, and appealed the decision. (Doc. #24 at 7.) In a letter to LINA, Wagner alleged that Miller did not have the pertinent medical records necessary to accurately assess the cause of Witcher's condition. (Doc. #24-10 at 42.) Wagner argued that hospital negligence, namely, dropping Witcher, caused Witcher's quadriplegia, not the accident. (Id. at 43.) Wagner also contends that, contrary to police assumptions, Witcher was not operating the vehicle at the time of the crash. (Id. at 42.)

In support of the negligence allegation, Wagner pointed to a radiology/imaging report on Witcher's spine conducted on December 8, 2003, at 9:58 p.m. (Id. at 43.) The scan indicated normal alignment of the spine with good vertical height. (Id.) Wagner then identifies a second radiology/imaging report, conducted two

hours and twenty-eight minutes after the initial report. (Id.) This report indicated a spinal fracture at C3-C4. (Id.) Wagner contends that, between the first and second radiology/imaging report, Witcher fell or was dropped. Wagner contends that this, not the accident, caused Witcher's quadriplegia. (Id.) As such, Wagner contends that Witcher's injury was not foreseeable, intentional, or self-inflicted. (Id.) Accordingly, Wagner argues that, regardless of whether Witcher was driving while intoxicated, Witcher is entitled to benefits under the LINA policy. (Id.)

Renee Worst was the LINA accident claims specialist assigned to handle Witcher's appeal. (Doc. #24-10 at 40.) In the course of the appeal, Witcher discontinued Wagner's services. (Doc. #24 at 7.) Witcher, through Zorita, took over his own appeal. (Id.) In a letter to Worst, Zorita detailed the errors in LINA's initial denial of Witcher's claim. (Doc. #24-10 at 4-15.) Witcher's arguments track the arguments raised in Wagner's letter to LINA. Namely, that Witcher was not driving the vehicle at the time of the crash and hospital negligence, not the crash, caused Witcher's quadriplegia. (Id.) As added support, Zorita explained that Witcher was able to move his limbs immediately following the accident. (Id.)

The letter also contained a section captioned "What Really Happened." (Id. at 9.) This section provides Witcher's version of events the night of the crash. In summary, Zorita provides that

Witcher bought toys for his kids. (Id.) Witcher wanted to deliver the toys to his children. (Id.) However, Witcher could not deliver the toys himself because Witcher's driver's license was suspended for an earlier DUI conviction. (Id.) As such, Witcher intended to drop off the toys with his brother. (Id.) Witcher's brother would then deliver the toys to Witcher's children. (Id.) In order to reach his brother's house, Witcher planned to ask a former roommate, Larry Hunter, to give him a ride. (Id.) Apparently, Witcher drove to Hunter's residence. (Id.) However, Hunter was not there. (Id.) Undeterred, Witcher knocked on the door of one of Hunter's neighbors, Jervey Boyd. (Id.) Boyd was an acquaintance of Witcher. (Id.) Witcher asked Boyd to drive him to his brother's house. (Id.) Boyd agreed and the accident occurred en route to Witcher's brother's house. (Id.) Accordingly, on this proffered series of events, Zorita argues that Boyd, not Witcher, was driving the vehicle at the time of the crash.

LINA investigated both allegations: (1) that Witcher was not the driver and (2) Witcher's quadriplegia was a result of medical negligence, not the accident. As to the former allegation, LINA hired an investigator to locate Boyd. (Doc. #24 at 9.) The investigator's report reveals that Boyd admitted that he knew Witcher; the two had met through a rehabilitation program. However, Boyd denied that he was the driver. (Id.) Boyd further expressed his dismay that he was being so accused. (Id.) Based on

this and other evidence, LINA found insufficient evidence to support Witcher's claim that he was not the driver. In the denial letter, LINA provided:

> While we acknowledge your contentions that Mr. Witcher was not the driver of the vehicle at the time of the crash, we can find no evidence to support that contention. Witnesses on the scene shortly after the crash, including one who lives within short distance of the site, failed to see any person in or near the vehicle except Mr. Witcher. The person who you contend was driving denies that he was the operator of the vehicle at the time. Additionally, the local police have concluded that Mr. Witcher was the driver of the vehicle and there is no evidence to support anyone else was driving.

(Doc. #24-8 at 42.)

LINA also investigated Witcher's allegation that Witcher's quadriplegia was caused by medical negligence. To that end, LINA first consulted a in-house physician advisor, Dr. Charles McCool. (Id. at 8.) McCool opined that paralysis need not be instantaneous to result in quadriplegia, countering Witcher's argument that since he was not paralyzed at the scene the crash did not cause his quadriplegia. (Id.)

LINA then hired an independent medical examiner, Dr. Kenneth B. Graulich to review Witcher's medical records and provide an opinion. (Id.) After a review of Witcher's medical records, the police report and Zorita's correspondence to LINA, Graulic concluded that the car crash, rather than the alleged fall at the hospital, caused Witcher's quadriplegia. (Id. a 8-9.) Graulic further concluded, contrary to Witcher's contentions, that it was

possible for Witcher to be thrown from the front to the back of the car as a result of the car crash. (Id. at 9.) A particular relevant portion of Graulich's opinion letter provides:

> The wife's arguments are not compelling in this case. Firstly, an accident of this nature could very likely throw a patient from the front to the back seat. In fact this is the most likely cause of his cervical spine paralysis. He did not fracture any vertebra. Rather he had a preexisting severe degenerative disease which likely caused a central cord contusion from a whiplash injury at the time of the accident. It would be far more likely for this to occur in an automobile accident of this magnitude, whether or not the patient was thrown over the back seat, then any kind of a fall in the hospital. There is as already stated no evidence that the patient fell in the hospital. The patient was clearly paralyzed from the motor vehicle accident when seen initially by the trauma unit while he was already restrained with a headboard. The wife provides no evidence other than her statements that there was another driver. She provides no other evidence other than her statement that the patient was dropped at the hospital. Her husband was certainly not "good" at the time he was brought to the hospital. He needed immediate intubation . . . .

(Doc. #24-9 at 32.) Based on the foregoing, LINA affirmed the initial claim denial, finding that group term accident insurance benefits are not payable.

**III. Standard**

**A. Summary Judgment in the ERISA context**

"[I]n an ERISA benefit denial case . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat.

Servs., Inc., No. 04-14097, 2005 WL 894840, *7 (11th Cir. March 16, 2005)(brackets in original)(quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)); accord Clark v. Hartford Life and Accident Ins. Co., No. 8:05-cv-67-T-23MAP, 2006 WL 890660, *2 (M.D. Fla. April 6, 2006).  "'[W]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" Crume v. Met. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)).

Thus, the standard applied in ERISA benefit denial cases is an altered version of the traditional summary judgment rules.  The Crume court articulately provided:

> [W]here the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point. In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

Id. at 1273.  Accordingly, the proper standard of review is as set forth in Curran and Crume.  This standard essentially modifies the traditional Rule 56 standard for ERISA disability benefits cases.

**B.   ERISA Standards**

"[T]he ERISA statute imposes on the plan participant the burden of showing that he is entitled to the 'benefits under the terms of his plan.'" Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1536 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a); Farley v. Benefit Trust Life Insurance Company, 979 F.2d 653, 658 (8th Cir. 1992)).  ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  In Firestone, the Supreme Court established three standards of review: "'(1) de novo where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] . . . [he has] . . . a conflict of interest." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004) (quoting HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001)).

In Williams, the Eleventh Circuit outlined the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

1. Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

Based on the "virtually all" language in Williams, it appears that the six step analysis applies in every ERISA long term disability benefits denial case. See Williams, 373 F.3d at 1137-38. In fact, recently, in Tippitt v. Reliance Standard Life Ins. Co., the Eleventh Circuit reinforced this approach. 457 F.3d 1227, 1232 (11th Cir. 2006). The Eleventh Circuit provided that "regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court

reviews de novo the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" Id.

Pursuant to Tippitt, the Court will begin with the first step of the Williams analysis and assess whether the administrator was wrong before proceeding with the remainder of the Williams analysis. In other words, before the Court undertakes the issues of whether the Plan grants LINA discretionary authority to determine entitlement to benefits, and whether LINA operates under any conflict of interest in making this determination, the Court will first decide whether LINA's decision to deny Witcher benefits was wrong.

**IV. Analysis**

**1. LINA's Motion for Summary Judgement and Witcher's Second Motion for Summary Judgement[2]**

Reviewing de novo, if the Court finds that LINA's denial of benefits was not wrong, LINA's decision will be upheld and the Court will end its analysis. As noted, LINA's decision is wrong if "the Court disagrees with the administrator's decision." Williams, 373 F.3d at 1138. The Court has analyzed LINA's plan interpretation and factual determinations. For the reasons stated below, the Court does not disagree with LINA's denial of benefits. As such, under the Williams framework, LINA's motion for summary

---

[2] In its motion for summary judgement, LINA requests oral argument. The Court finds oral argument unnecessary. Accordingly, that request is denied.

judgment is granted and the Court ends it analysis. (Doc. #24 at 16.)

**A. Plan Interpretation**

In the denial letter, LINA cites the applicable provisions of the DynCorp policy:

> We will pay benefits for loss from bodily injuries:
>     a. caused by accident which happens while an
>        insured is covered by this policy; and
>     b. which, directly and from no other causes,
>        result in a covered loss.
> We will not pay benefits if the loss was caused by:
>     1. sickness, disease or bodily infirmity; or
>     2. any of the exclusions listed.
>
> The Dyncorp policy includes this exclusion:
>     No benefits will be paid for loss resulting from:
>         1. intentionally self-inflicted injuries or
>            any attempt thereat while sane or insane.

(Doc. #24-11 at 24.)

As noted, LINA argues that Witcher's crash was non-accidental and self-inflicted. Witcher argues that LINA's plan interpretation is incorrect. Namely, Witcher argues that there is no DUI exclusion. Moreover, citing Fifth and Seventh circuit cases, Witcher argues that the crash was accidental and not self-inflicted. However, courts within this circuit have articulated the error in this argument.

In <u>Shulz v. Metropolitan Life Insurance Co.</u>, a case with a similar factual underpinning to this case, the court provided:

> In a case strikingly similar to the instant case, a court
> upheld a denial of accidental death benefits claimed by
> the beneficiary of a driver who was intoxicated at the
> time of his death. There, the decedent had a BAC of .25%
> at the time of his single vehicle accident. As in this
> case, the plaintiff contended the insurance company's

>denial of benefits was arbitrary and capricious because the insurance plan did not expressly exclude benefits because of an insured's intoxication. The court rejected this argument and held that the decedent's death was not **accidental** because it was the foreseeable result of his intentional actions. Additionally, the court noted, the injury was at least partially **self-inflicted**.

994 F.Supp 1419, 1422 (M.D. Fla. 1997)(citations omitted)(emphasis added); see also Nelson v. Sun Life Assurance Co., 962 F.Supp. 1010 (W.D. Mich. 1997)(upholding benefits denial where insured had a blood alcohol level of .18). The same reasoning applies here.

As the Shulz court noted, "'[i]t is clearly foreseeable that driving while intoxicated may result in death or bodily harm.'" Id. (citing Fowler v. Metropolitan Life Ins. Co., 938 F.Supp. 476 (W.D. Tenn. 1996)). Thus, even if Witcher did not expect to crash his car, the forseeability of being impaired when driving while intoxicated turns what would otherwise be characterized as an accident into a non-accidental event.

Furthermore, while Witcher did not purposefully crash, the crash is still self-inflicted. The intent is garnered from the acts preceding the crash, namely, the intent to drink the alcohol and the intent to operate the vehicle while intoxicated. Thus, if Witcher intentionally drank alcohol and, while intoxicated, intentionally operated a vehicle, the necessary intent is present. For the foregoing reasons, LINA's interpretation is not wrong. The crash was both non-accidental and self-inflicted.

**B. Factual Determination**

As noted, Witcher argues that he was not driving the vehicle at the time of the crash. Moreover, Witcher also argues that his quadriplegia stemmed from medical negligence following the accident. On these two contentions, Witcher argues that his quadriplegia was neither accidental nor self-inflicted. LINA spent significant resources investigating these claims, including hiring an investigator to locate and interview the alleged driver, consulting an in-house physician and hiring an independent medical examiner.

Each source confirmed that Witcher was the driver and that the Witcher's quadriplegia stemmed from the crash. The investigator located and spoke with Jervey Boyd, the individual that Witcher alleges was driving the car. Boyd vehemently denied that he was the driver. Moreover, Boyd expressed distress that he was being so accused. The in-house physician informed that quadriplegia does not have to be instantaneous, quelling Witcher's arguments that since he could move his limbs directly after the crash his quadriplegia must be the result of medical negligence. Lastly, as provided above, the independent medical examiner found that Witcher's arguments "are not compelling in this case." (Doc. #24 at 9.)

LINA's denial was further guided by law enforcement's conclusion that Witcher was operating the vehicle at the time of the crash. In fact, on this finding and coupled with Witcher's illegal blood alcohol content, a warrant charging, inter alia, DUI was issued for Witcher's arrest. Based on the foregoing, the Court

cannot say that LINA's determination was wrong. Having decided that LINA's decision was not wrong, the Court ends its Williams analysis and affirms the decision.

**2. First motion for summary judgment, motion to dismiss and motion to strike**

As noted, early in this litigation, LINA moved to dismiss Witcher's complaint. The Court granted the motion and granted Witcher leave to amend his complaint. Before filing an amended complaint, Witcher filed a motion for summary judgment, despite the absence of an operative complaint. LINA moved to strike the motion for summary judgment (Doc. #15). On the same day, LINA filed a motion to dismiss (Doc. #14). LINA sought dismissal with prejudice pursuant to Federal Rule of Civil Procedure 41(b). LINA argued that the case should be dismissed because Witcher has failed to comply with the Court's orders and the applicable rules of civil procedure.

Subsequent to the filing of these motions, Witcher filed an amended complaint (Doc. #17). Moreover, through this order, the Court grants LINA's motion for summary judgment. As such, Witcher's first motion for summary judgment, LINA's motion to strike and LINA's motion to dismiss are moot. Summit v. United States Steel Corp., 639 F.2d 1278, 1281 (5th Cir. March 19, 1981) ("filing of the Amended Complaint moots the pending motions for partial summary judgment and dismissal . . . ."). Accordingly, the Court will deny these motions as moot.

Accordingly, it is now

**ORDERED, ADJUDGED** and **DECREED**:

1. Witcher's First Motion for Summary Judgment (Doc. #13) is **DENIED** as moot.

2. Witcher's Second Motion for Summary Judgment (Doc. #22) is **DENIED**.

3. LINA's Motion to Dismiss (Doc. #14) is **DENIED** as moot.

4. LINA's Motion to Strike (Doc. #15) is **DENIED** as moot.

5. LINA's Motion for Summary Judgment (Doc. #24) is **GRANTED**. The Clerk of the Court shall enter judgment accordingly and close the file.

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 11th day of December, 2006.

/s/ Virginia M. Hernandez Covington<br>
VIRGINIA M. HERNANDEZ COVINGTON<br>
UNITED STATES DISTRICT JUDGE

Copies:
All Counsel and Parties of Record